IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

HWH CORPORATION,
a Montana Corporation,

    Plaintiff,

vs.

DELTROL CORP.,
a Delaware Corporation,

    Defendant.

No. C07-0059

RULING ON MOTION FOR
SUMMARY JUDGMENT

---

TABLE OF CONTENTS

I.    *INTRODUCTION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   *PROCEDURAL HISTORY*. . . . . . . . . . . . . . . . . . . . . . . 2

III.  *RELEVANT FACTS*. . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.  *LEGAL STANDARD FOR SUMMARY JUDGMENT*. . . . . . . . . . . . . . 4

V.   *DISCUSSION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     A.    *Breach of Implied Warranties (Counts I and II)*. . . . . . . . . . . . 5
     B.    *Breach of Express Warranty (Count III)*. . . . . . . . . . . . . . . 14
     C.    *Breach of Contract (Count V)*. . . . . . . . . . . . . . . . . . . 16
     D.    *Promissory Estoppel Claim (Count VI)*. . . . . . . . . . . . . . . 17
     E.    *Negligence and Negligent Misrepresentation (Counts IV and VII)*. . . 19

VI.  *CONCLUSION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## I. INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment (docket number 22) filed by Defendant Deltrol Corp. ("Deltrol") on November 17, 2008; the Resistance to Defendant's Motion for Summary Judgment (docket number 24) filed by

Plaintiff HWH Corporation ("HWH") on December 11, 2008; and Reply to Resistance to Motion of Summary Judgment (docket number 29) filed by Deltrol on December 22, 2008. Deltrol's request for oral argument is denied. Pursuant to Local Rule 7.c, this matter will be decided without oral argument.

## II. PROCEDURAL HISTORY

On June 15, 2007, HWH filed a Complaint and Jury Demand (docket number 1) seeking monetary damages from Deltrol, arising from the purchase of solenoid valves. HWH claims breach of implied warranty of merchantability (Count I), breach of implied warranty of fitness for a particular use (Count II), breach of express warranty (Count III), negligence (Count IV), breach of contract (Count V), promissory estoppel (Count VI), and negligent misrepresentation (Count VII). On September 19, 2007, Deltrol filed an Answer, Affirmative Defenses and Counterclaim (docket number 6).

On October 9, 2007, HWH filed an Answer to Counterclaim (docket number 8). On November 3, 2008, both parties consented to proceed before a United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). A jury trial is scheduled before the undersigned on April 20, 2009. Deltrol filed the instant Motion for Summary Judgment (docket number 22) on November 17, 2008.

## III. RELEVANT FACTS

HWH is in the business of manufacturing slide-out mechanisms and leveling mechanisms, including air leveling systems, for use on recreational vehicles. Deltrol is in the business of manufacturing solenoid valves, among other things. Solenoid valves are an essential component of HWH's air leveling system.

In 2001, Deltrol marketed its solenoid valves to HWH and solicited HWH's business. To establish "dual sourcing" for solenoid valves, HWH told Deltrol that it would consider their solenoid valves if they could produce a valve that performed as well as the valves which they were using at that time. For many years, HWH had been using solenoid valves made by Automatic Valve Corporation ("Automatic") for its air leveling

2

system. HWH provided Deltrol with drawings of the Automatic valve and an Automatic valve for "reverse engineering."[1] HWH told Deltrol that the application of the valve would be underneath recreational vehicles, and that the valve would be exposed to road and weather conditions. Deltrol was also told by HWH that the valves would need to function properly under any traveling, road, and weather conditions.

Deltrol designed a solenoid valve for use in HWH's air leveling systems. On July 13, 2001, Deltrol provided 25 prototype samples of the valve to HWH. HWH tested one of the valve samples in salt water, which caused parts of the valve to rust. As a result, stainless steel was added to the internal parts to avoid the rusting problem.[2] Deltrol manufactured a new stainless steel prototype sample of the valve. On April 3, 2002, HWH ordered 100 samples of the new prototype valve.

In August 2002, HWH made a pilot run of the Deltrol valves on a Foretravel RV and a Beaver Coach. During the pilot run, HWH requested adjustments to the valves, and ultimately determined that there were no problems with the valves based on the pilot run testing. On November 19, 2002, HWH purchased 155 more valves from Deltrol for a second pilot run. Satisfied with the performance of the valves in both pilot runs, on May 19, 2003, HWH purchased 5,000 to 6,000 valves from Deltrol to be used in production on the air leveling systems.

On November 25, 2003, HWH placed a second production order of 5,000 more valves from Deltrol. HWH placed a third order of 5,000 valves on August 27, 2004. On

---

[1] The drawings of the Automatic valve included a list of specifications. *See* Deltrol's Appendix at 1. The specifications on the drawing were: (1) Valve must operate continuously at 15 volts DC; (2) valve must open against 115 PSI at 8 volts DC; (3) valve must be 0 (zero) leak; (4) orifice size is 3/32' in diameter; (5) valve must withstand 90 PSI back pressure without leaking; and (6) use molded coil. *Id.*

[2] A new drawing was provided to Deltrol which included an additional specification. The new specification was: Anodized aluminum base. All stainless steel internal components, including spring and plunger. *See* Deltrol's Appendix at 6.

February 23, 2005, however, HWH cancelled its third order because the valves were failing on some recreational vehicles due to moisture getting into the coils. On June 15, 2007, HWH filed its Complaint and Jury Demand in the instant action, seeking damages from Deltrol. Additional facts which are relevant to the issues will be set forth below.

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "An issue is genuine when 'a reasonable jury could return a verdict for the nonmoving party.'" *Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 821 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson*, 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears the initial responsibility of informing the court of the basis for its motion, and must identify those portions of the record which it contends show a lack of a genuine issue of material fact. *Heisler v. Metropolitan Council*, 339 F.3d 622, 631 (8th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (same). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see, e.g., Baum v. Helget Gas Products, Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The

4

nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## V. DISCUSSION

Deltrol asserts that it is entitled to summary judgment on all of HWH's claims: (1) breach of implied warranty of merchantability, (2) breach of implied warranty of fitness for a particular use, (3) breach of express warranty, (4) negligence, (5) breach of contract, (6) promissory estoppel, and (7) negligent misrepresentation. HWH argues that Deltrol is not entitled to summary judgment on any of its claims.

### A. Breach of Implied Warranties (Counts I and II)

The parties agree that this transaction is governed by Article 2 of the Uniform Commercial Code. In a contract for the sale of goods by a merchant, a warranty that the goods will be merchantable[3] is implied.

> Unless excluded or modified (section 554.2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

Iowa Code section 554.2314(1); *see also Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103, 108 (Iowa 1995) ("Under Iowa law a warranty that goods sold are merchantable is implied in a contract for their sale."); *Van Wyk v. Norden Laboratories, Inc.*, 345 N.W.2d 81, 84 (Iowa 1984) ("The warranty of merchantability . . . is based on a purchaser's reasonable expectation that goods purchased from a 'merchant with respect to goods of that kind' will be free of significant defects and will perform in the way goods of that kind should perform.").

---

[3] Goods are "merchantable" if they "are fit for the ordinary purposes for which such goods are used." Iowa Code section 554.2314(2)(c).

5

In addition, under some circumstances there is an implied warranty that the goods will be fit for a particular purpose.

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

Iowa Code section 554.2315; *see also Tomka*, 528 N.W.2d at 108 ("[I]f the seller has reason to know at the time of contracting that the buyer is purchasing the goods for a particular purpose and that the buyer is relying on the seller's skill and judgment to furnish suitable goods, there arises a warranty that the goods shall be fit for that purpose."); *Van Wyk*, 345 N.W.2d at 84 ("[T]he warranty of fitness for a particular purpose . . . is based on a special reliance by the buyer on the seller to provide goods that will perform a specific use envisaged and communicated by the buyer.").

In *Renze Hybrids, Inc. v. Shell Oil Company*, 418 N.W.2d 634, 637 (Iowa 1988), the Iowa Supreme Court explained the distinction between the implied warranty of merchantability and the implied warranty of fitness for a particular use:

> A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.

*Id*. (citing Comment 2 to UCC section 2-315 contained in Iowa Code Annotated section 554.2315).

Deltrol argues that it is entitled to summary judgment on HWH's claims for breach of implied warranty of merchantability and breach of implied warranty of fitness for particular use because:

> HWH provided detailed drawings and specifications to Deltrol for the valves, Deltrol manufactured the valves in accord with

6

> those drawings and specifications, and HWH examined, pilot
> tested and subsequently accepted the valves Deltrol
> manufactured. Under these circumstances, each of HWH's
> [breach of implied warranties] claims fail and should be
> dismissed.

(*See* Deltrol's Brief in Support of Motion for Summary Judgment at 3.) HWH argues that

there are genuine issues of material fact precluding summary judgment on its claims of

breach of implied warranties. For example, HWH submits that there are genuine issues

of material fact as to: (1) whether its method of testing the valves included the kinds of

testing that would have revealed the problem with the valves; (2) whether it is an expert

or professional in the field of solenoid valves, coils, or molded coils; and (3) whether a

buyer in HWH's position should have detected the defect in the valves or whether the

valves had a latent defect. HWH also argues that the specifications it provided to Deltrol

were not so "complete" or "precise" as to negate the implied warranties.

　　　Iowa Code section 554.2316 establishes the circumstances under which the implied

warranties of merchantability and fitness for a particular use may be excluded or modified.

Here, Deltrol relies on Section 554.2316(3)(b), which states:

> [W]hen the buyer before entering into the contract has
> examined the goods or the sample or model as fully as the
> buyer desired or has refused to examine the goods there is no
> implied warranty with regard to defects which an examination
> ought in the circumstances to have revealed to the buyer[.]

Iowa Code section 554.2316(3)(b); *see also Henry Heide, Inc. v. WRH Products Co., Inc.*,

766 F.2d 105, 110-11 (3d Cir. 1985) ("[I]f a buyer undertakes a reasonable examination

of the goods, he is precluded from asserting a claim for breach of implied warranty against

anyone who was responsible for a defect that the buyer ought, in the circumstances, to

have noticed. The concept of this section is that when a buyer examines a product fully,

the buyer is on notice that he bears the risk of loss as to defects that ought to have been

revealed.").

It is undisputed that the solenoid valves supplied to HWH by Deltrol failed due to moisture penetrating the coils in the valve.[4] In purchasing solenoid valves from Deltrol, HWH had a reasonable expectation that the valves it was purchasing would "be free of significant defects and [would] perform in the way goods of that kind should perform." *Van Wyk*, 345 N.W.2d at 84. The implied warranty of fitness for a particular use is also applicable because HWH communicated to Deltrol that it was purchasing the valves for a specific use on recreational vehicles. *Id.* ("[T]he warranty of fitness for a particular purpose . . . is based on a special reliance by the buyer on the seller to provide goods that will perform a specific use envisaged and communicated by the buyer.").

Deltrol argues that HWH's implied warranty claims are excluded under Iowa Code section 554.2316(3)(b) because HWH provided it with detailed drawings and specifications, it manufactured the valves according to the drawings and specifications, and HWH examined the valves before accepting them. Deltrol cites Comment 9 to the UCC, which states:

> The situation in which the buyer gives precise and complete specifications to the seller is not explicitly covered in this section, but this is a frequent circumstance by which the implied warranties may be excluded. . . . Thus, where the buyer gives detailed specifications as to the goods, neither of the implied warranties as to quality will normally apply to the transaction unless consistent with the specifications.

Iowa Code Annotated section 554.2316, comment 9.

In addition, Deltrol argues that HWH was given a full opportunity to inspect prototype valves and did, in fact, conduct its own testing. HWH argues that its testing was

---

4 *See* HWH's Statement of Additional Material Facts Precluding Summary Judgment at 6, ¶ 17. In its Response to Plaintiff's Statement of Additional Facts, Deltrol admitted ¶ 17, but noted that "[t]he valves, however, failed only on one particular type, Newmar." *See* Deltrol's Response at 6, ¶ 17.

not intended to be comprehensive and that the defect resulting in the valve's failure was not readily noticeable to inspection.

> The particular buyer's skill and the normal method of examining goods in the circumstances determine what defects are excluded by the examination. A failure to notice defects which are obvious cannot excuse the buyer. However, an examination under circumstances which do not permit chemical or other testing of the goods would not exclude defects which could be ascertained only by such testing. Nor can latent defects be excluded by a simple examination. A professional buyer examining a product in his field will be held to have assumed the risk as to all defects which a professional in the field ought to observe, while a nonprofessional buyer will be held to have assumed the risk only for such defects as a layman might be expected to observe.

Iowa Code Annotated section 554.2316, comment 8.

The pertinent evidence for resolving the implied warranties issue includes: (1) HWH's expert, Thomas O. Goodney ("Goodney"), opined that the defect in Deltrol's solenoid coil "is a hidden defect that would not be foreseen by a reasonable and knowledgeable person looking at the construction of the coil assembly";[5] (2) Goodney further opined that "[t]he application of the air valve was shown to Deltrol personnel and they were shown the location of the air valve on the chassis. It is obvious that moisture and water spray would be one of the design considerations for the application";[6] (3) Goodney also opined that "[t]he air valve drawings provided by HWH to Deltrol are requirement drawings and not design drawings. The drawings give the operating and interface parameters. The drawings leave the design of the coil, operating valve, molding and sealing for the supplier's engineers to make the final product fit for use in its operating

---

[5] *See* HWH's Appendix at 16 (Goodney's Opinions, p. 3, ¶ 2).

[6] *Id.* at 17 (Goodney's Opinions, p. 4, ¶ 6).

environment";[7] (4) Paul E. Hanser ("Hanser"), an HWH executive, stated in his deposition that HWH lacked expertise in solenoid air valves, coils, and molded coils;[8] (5) in his deposition, Hanser also testified that HWH relied on Deltrol for the testing of the air valves;[9] and (6) in discussing the Automatic valve drawings supplied to Deltrol,

---

[7] *Id.* (Goodney's Opinions, p. 4, ¶ 7).

[8] *Id.* at 26 (Paul E. Hanser's Deposition). Hanser's deposition provides:

    A:     Again, we just have the requirement they work for our application.

    Q:     Okay.

    A:     We don't care really how people make something as long as it works for our application.

    Q:     So are you telling me there were no air ingress specifications or dust ingress specifications that went with those valves?

    A:     No, sir.

    Q:     No water ingress specifications?

    A:     No.

    Q:     Okay.

    A:     That's their job.

    Q:     If you didn't instruct them on what level of ingress of air, particulate, or moisture, how would they know?

    A:     Because they make valves for these mobile applications, so that's their expertise.

    Q:     All right.

    A:     If we were experts at making these, we would have made them in-house. There would be no point in us going to an outside firm.

(Hanser's Deposition, p. 21, l. 10 - p. 22, l. 8.)

[9] *See* HWH's Appendix at 35. Hanser's deposition provides:

    Q:     Okay. Do you know how HWH determined whether those sample air valves worked as well as the competition's?

    A:     What--the tests we ran was the mechanical, like I said, did they screw into the seat. Did they meet the

(continued...)

Hanser stated that the drawings and specifications on the drawings, did not constitute complete design specifications or engineering drawings.[10]

---

[9](...continued)

        electrical specs on there. That's what we were checking for. But the work, as well, would be the responsibility of Deltrol. Like on the coils, and all this, we didn't do those testings. We relied on them.

Q:   Well, how would you determine if they'd get the business if you didn't check out whether they worked as well?

A:   Well, you have to have--assume that your supplier is reliable and furnishes you reliable product. If we bought a Cummins engine, we don't tear the engine down and check all the pistons and everything in there. We assume--we just-- When we buy a Cummins engine, we assume that engine is going to run and perform reliably.

(Hanser's Deposition, p. 56, l. 12 - p. 57, l. 8.)

[10] *Id.* at 39. Hanser's deposition provides in pertinent part:

Q:   This was the final requirement drawing from HWH to Deltrol for the air valve that they were attempting to sell to HWH, is that correct?

A:   I don't like your--Excuse me.

Q:   Go ahead.

A:   I don't like your term 'requirement drawing.' This is a document for purchasing the part.

Q:   Okay. Let's call it a purchasing drawing then. . . .

Q:   And it listed all the specifications that HWH had-- . . .

A:   It listed some of the specifications. It didn't list all of them. . . .

A:   It's specifying the valve that they submitted for a sampling. I'm having trouble what you're heading for. This is a drawing so both companies can know what we're talking about.

Q:   I understand. I think it takes--

A:   But it's not an engineering drawing, and it's not a

(continued...)

The Court finds that there are genuine issues of material fact which preclude summary judgment on HWH's implied warranty claims. First, even though HWH tested the valves before accepting them, there is a genuine issue of fact as to whether HWH would have discovered the defect in the valves through its own testing, or through other testing of any kind. HWH's expert opined that Deltrol's valves contained a hidden defect that "would not be foreseen by a reasonable and knowledgeable person looking at the construction of the coil assembly."[11] Claims for breach of implied warranties may be excluded under Iowa Code section 554.2316(3)(b) when after examining the product, the buyer "ought in the circumstances" to have discovered the defect. Here, there is a genuine issue of material fact as to whether HWH could have discovered the defect in the valves based on the examination it performed on the valves. Therefore, Iowa Code section 554.2316(3)(b) does not bar HWH's claims for breach of implied warranty of merchantability or breach of implied warranty of fitness for a particular use. *Canadian Pacific Railway Co. v. Williams-Hayward Protective Coatings, Inc.*, 2005 WL 782698 at *14 (N.D. Ill. 2005) (Plaintiff raised a genuine issue of material fact that a product's defects "were not obvious upon mere examination. Whether [Plaintiff's] examination precludes it from bringing the implied warranty claims is a question for the jury.").

Second, HWH informed Deltrol that the valve it produced would need to perform as well as the valve produced by Automatic. HWH also explained that the application of the valve would be underneath recreational vehicles, and that the valve would be exposed to road and weather conditions. Additionally, Hanser testified in his deposition that HWH

---

[10](...continued)

> requirement drawing. It doesn't list virtually any of the
> engineering specifications.

(Hanser's Deposition, p. 79, l. 1 - p. 80, l. 21.)

[11] *See* HWH's Appendix at 16 (Goodney's Opinions, p. 3, ¶ 2).

relied on Deltrol for the testing of the valves.[12] In *Renze Hybrids, Inc.*, the Iowa Supreme Court explained that the implied warranty of fitness for a particular use turns "'on the 'bargain-related' facts as to what the seller had reason to know about the buyer's purpose for the goods and about his reliance on the seller's skill or judgment in selecting them.'" 418 N.W.2d at 638 (quoting *Van Wyk*, 345 N.W.2d at 84). Here, there are fact issues as to HWH's reliance on Deltrol's skill and judgment to produce valves for HWH's particular use. *See Renze Hybrids, Inc.*, 418 N.W.2d at 638 ("[I]t is evident that [the plaintiff] did in fact rely on [the defendant's] skill or judgment to furnish suitable goods. We conclude there was sufficient evidence of bargain-related facts to submit [the] claim to the jury.").

Lastly, Goodney opined that the drawings and specifications HWH supplied to Deltrol were requirement drawings, and were not complete design drawings. Specifically, Goodney stated "[t]he drawings leave the design of the coil, operating valve, molding and sealing for the supplier's engineers to make the final product fit for use in its operating environment."[13] In his deposition, Hanser also testified that the drawings and specifications on the drawings, did not constitute complete design specifications or engineering drawings.[14] The Court finds that there is a genuine issue of material fact as to whether the drawings and specifications provided by HWH to Deltrol are so detailed as to exclude HWH's implied warranty claims.

In summary, the Court concludes that there are genuine issues of material fact which preclude summary judgment on HWH's implied warranty claims.

---

[12] *See* HWH's Appendix at 35 (Hanser's Deposition, p. 56, l. 12 - p. 57, l. 8).

[13] *Id.* at 17 (Goodney's Opinions, p. 4, ¶ 7).

[14] *Id.* at 39 (Hanser's Deposition, p. 79, l. 1 - p. 80, l. 21).

## B. Breach of Express Warranty (Count III)

Deltrol argues that it is entitled to summary judgment on HWH's breach of express warranty claim because there is no evidence that the valves failed to comply with the specifications provided by HWH. In response, HWH argues that summary judgment is inappropriate because "[t]here are facts from which the jury could find Deltrol expressly warranted a valve as good in quality and function as Automatic's and that that warranty was breached."[15]

An express warranty may be established by any promise or description of the goods which becomes "part of the basis of the bargain."

> 1.  Express warranties by the seller are created as follows:
> a.  Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> b.  Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
> c.  Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the description.

Iowa Code section 554.2313(1); *see also Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812, 825 (N.D. Iowa 1997) ("An express warranty may be created by any affirmation of fact or promise made by a seller which relates to the goods.").

Included in the "Terms and Conditions" of HWH's purchase order is an express warranty which states in pertinent part:

> The seller expressly warrants that all goods and services furnished hereunder will conform to the specifications, drawings, samples, or other description furnished or adopted

---

[15] *See* HWH's Brief in Resistance to Defendant's Motion for Summary Judgment at 26.

> by the buyer and will be of good material and workmanship
> and free from defects. . . .

(*See* HWH's Appendix at 8, HWH's Purchase Order, ¶ 8 of the "Terms and Conditions.")
It is undisputed that the solenoid valves supplied to HWH by Deltrol failed due to moisture
penetrating the coils in the valve.[16] HWH's expert opined that the "solenoid coil contains
a defect or defects that allow moisture and salt water entry into the interior components of
the coil causing coil failure."[17] The Court finds that there are facts from which a jury
could conclude that Deltrol breached an express warranty that the valves would be "free
from defects."

Additionally, HWH argues that there are "facts from which a jury could find
Deltrol expressly warranted a valve as good in quality and function as Automatic's and that
that warranty was breached."[18] It is undisputed that HWH communicated to Deltrol that
it "wanted and needed a valve that would perform as well as the Automatic valve."[19]
Under Iowa Code section 554.2313(1)(a), an express warranty is created by "[a]ny
affirmation of fact or promise made by the seller to the buyer which relates to the goods
and becomes part of the basis of the bargain." *See also Tralon Corp.*, 966 F. Supp. at
825. The Court finds that there are facts from which a jury could conclude that Deltrol

---

[16] *See* HWH's Statement of Additional Material Facts Precluding Summary
Judgment at 6, ¶ 17. In its Response to Plaintiff's Statement of Additional Facts, Deltrol
admitted ¶ 17, but noted that "[t]he valves, however, failed only on one particular type,
Newmar." *See* Deltrol's Response at 6, ¶ 17.

[17] *See* HWH's Appendix at 16 (Goodney's Opinions, p. 3, ¶ 2).

[18] *See* HWH's Brief in Resistance to Defendant's Motion for Summary Judgment
at 26.

[19] *See* HWH's Statement of Additional Material Facts Precluding Summary
Judgment at 3, ¶ 8. In its Response to Plaintiff's Statement of Additional Material Facts,
Deltrol admitted ¶ 8. *See* Deltrol's Response at 3, ¶ 8 ("RESPONSE: For purposes of
the Defendant's Motion for Summary Judgment, this is admitted.").

breached an express warranty that its valves would perform as well as the Automatic valves.

Accordingly, the Court concludes that there are genuine issues of material fact which preclude summary judgment on HWH's express warranty claim.

### C. Breach of Contract (Count V)

Deltrol argues that it is entitled to summary judgment on HWH's breach of contract claim because "the valves were manufactured in accord with HWH's specifications and HWH examined and tested the valves before finally accepting and placing orders for them."[20] Specifically, Deltrol argues that HWH's breach of contract claim fails because "[t]he valves were exactly what HWH requested."[21]

HWH argues that there are genuine issues of material fact which preclude summary judgment on its breach of contract claim. Specifically, HWH argues that there are genuine issues of material fact as to whether Deltrol breached its contract with HWH by producing a valve that did not meet the specifications provided by HWH, and by breaching the terms of the express warranties included in the purchase order agreement.

In a claim for breach of contract, the plaintiff must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) plaintiff performed all the terms and conditions required by the contract; (4) defendant breached the contract; and (5) plaintiff suffered damages as a result of the breach. *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa-Illinois Gas & Electric Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993)).

Here, the parties contracted for the purchase of solenoid valves. Under the terms of the contract, Deltrol agreed to provide HWH with a valve that was "free from

---

[20] *See* Deltrol's Brief in Support of Motion for Summary Judgment at 9.

[21] *Id.* at 10.

defects."[22] HWH's expert opined that the valves supplied by Deltrol contained a "defect or defects that allow moisture and salt water entry into the interior components of the coil causing coil failure."[23] Accordingly, the Court finds that there are facts from which a jury could conclude that Deltrol breached the contract to provide HWH with valves that would be "free from defects."

Therefore, the Court concludes that there are genuine issues of material fact which preclude summary judgment on HWH's breach of contract claim.

### D. Promissory Estoppel Claim (Count VI)

Deltrol argues that it is entitled to summary judgment on HWH's promissory estoppel claim because:

> HWH did not rely upon any representations or promises made
> by Deltrol. It relied upon its own specifications, examination,
> testing and judgment in determining that the valves met its
> needs.

(See Deltrol's Brief in Support of Motion for Summary Judgment at 11.) HWH argues that there are genuine issues of material fact which preclude summary judgment on its promissory estoppel claim. Specifically, HWH argues that summary judgment is inappropriate because "[t]here are facts from which a jury could find that Deltrol promised to provide a valve of the same function and quality as Automatic's valve and represented that it was doing so."[24]

The elements of promissory estoppel are:

> (1) a clear and definite promise; (2) the promise was made
> with the promisor's clear understanding that the promisee was

---

[22] See HWH's Appendix at 8 (HWH's Purchase Order, ¶ 8 of the "Terms and Conditions").

[23] Id. at 16 (Goodney's Opinions, p. 3, ¶ 2).

[24] See HWH's Brief in Resistance to Defendant's Motion for Summary Judgment at 28.

seeking an assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise.

*Schoff v. Combined Insurance Co. of America*, 604 N.W.2d 43, 49 (Iowa 1999).

It is undisputed that HWH communicated to Deltrol that it "wanted and needed a valve that would perform as well as the Automatic valve."[25] In his deposition, Leroy Van Roekel, a mechanical engineer for HWH, testified that HWH requested a valve from Deltrol that would "work like the Automatic [valve]."[26] Deltrol also understood that its valve needed to perform like the Automatic valve in order to get HWH's business.[27]

---

[25] *See* HWH's Statement of Additional Material Facts Precluding Summary Judgment at 3, ¶ 8. In its Response to Plaintiff's Statement of Additional Material Facts, Deltrol admitted ¶ 8. *See* Deltrol's Response at 3, ¶ 8 ("RESPONSE: For purposes of the Defendant's Motion for Summary Judgment, this is admitted.").

[26] *See* HWH's Appendix at 55 (Van Roekel's Deposition, p. 34, 1. 10). Van Roekel's deposition testimony further states:

A: That we requested a valve--we requested a valve to work under the coach as--like the Automatic did, and--which is what they were to give us, and said they were giving us; is a valve that would work like the Automatic.

(Van Roekel's Deposition, p. 34, 1. 6-10.)

[27] *Id.* at 68. In his deposition testimony, Gregory McIntyre, a Deltrol salesman who worked with HWH, stated:

Q: Now, you did know that the valves needed to work as well in the application as the Automatic valves, didn't you, sir?

A: Yeah.

Q: In fact, that's what you wrote . . . to Mr. Parks, we will get the business as long as the sample valves work as well as the competition. Is that right?

A: Right. . . .

(continued...)

18

When purchasing valves from Deltrol, HWH acted on Deltrol's assurance that the valves it provided would work as well as the Automatic valves. HWH subsequently installed the valves on recreational vehicles, and some of the valves failed. The Court finds that there are facts upon which a jury could find in favor of HWH on its promissory estoppel claim.

Therefore, the Court concludes that there are genuine issues of material fact which preclude summary judgment on HWH's promissory estoppel claim.

### E. Negligence and Negligent Misrepresentation (Counts IV and VII)

Deltrol argues that it is entitled to summary judgment on HWH's negligence claim because it produced the valves in accordance with HWH's specifications; and therefore, did not breach the standard of care. As to HWH's negligent misrepresentation claim, Deltrol asserts that this claim fails because:

> HWH did not rely upon any representations or promises made by Deltrol. It relied upon its own specifications, examination, testing and judgment in determining that the valves met its needs.

(See Deltrol's Brief in Support of Motion for Summary Judgment at 11.) Lastly, Deltrol argues that both claims fail because they are barred by the economic loss doctrine.

HWH argues that there are fact issues on its negligence and negligent misrepresentation claims which preclude summary judgment. As to its negligence claim, HWH argues that Deltrol breached its duty to act reasonably in:

> failing to use completely molded coil, in failing to properly reverse engineer the Automatic valve so it could honor its promise to provide an equivalent valve, in failing to conduct sufficient environment testing to identify the problem with the valves, and in failing to identify and use appropriate water ingress standards[.] . . .

---

[27](...continued)

> Q:   Your answer to my question was yes; is that correct?
> A:   That is correct.

(McIntyre's Deposition, p. 39, l. 20 - p. 40, l. 10.)

(*See* HWH's Brief in Resistance to Defendant's Motion for Summary Judgment at 26.)
With regard to the negligent misrepresentation claim, HWH argues that summary judgment
is inappropriate because "[t]here are facts from which a jury could find that Deltrol
promised to provide a valve of the same function and quality as Automatic's valve and
represented that it was doing so."[28] Lastly, HWH argues that the economic loss doctrine
is not applicable to this case because this case involves damage to property and the failure
of the valves was a serious product defect.

In *Determan v. Johnson*, 613 N.W.2d 259 (Iowa 2000), the Iowa Supreme Court
reviewed the law governing the economic loss doctrine:

> We first addressed this issue in *Nebraska Innkeepers, Inc. v.
> Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124 (Iowa 1984).
> In that case this court adopted the general rule that a plaintiff
> 'cannot maintain a claim for purely economic damages arising
> out a defendant's alleged negligence.' *Nebraska Innkeepers*,
> 345 N.W.2d at 128.
>
> In a subsequent decision, we extended this rule to bar claims
> based on strict liability in tort where a product sold by the
> defendant to the plaintiff failed to perform as it was expected,
> but caused no physical injury to person or property. *Nelson v.
> Todd's Ltd.*, 426 N.W.2d 120, 123 (Iowa 1988). . . .
>
> [W]e have required at a minimum that the damage for which
> recovery is sought must extend beyond the product itself.
> *Compare Flom v. Stahly*, 569 N.W.2d 135, 141 (Iowa 1997)
> (holding plaintiff's claim was contractual in nature because
> harm caused by defect was limited to product) *with American
> Fire & Cas. Co. v. Ford Motor Co.*, 588 N.W.2d 437, 438-39
> (Iowa 1999) (permitting tort recovery where defect caused a
> sudden and dangerous occurrence causing damage not only to
> the product but to other property as well).

---

[28] *See* HWH's Brief in Resistance to Defendant's Motion for Summary Judgment
at 28.

*Id.* at 261-62. In determining the proper remedy for a plaintiff's loss, courts should consider: (1) the nature of the defect; (2) the type of risk; and (3) the manner in which the injury arose. *Id.* at 263 (citing *Nelson*, 426 N.W.2d at 125, in turn citing *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1173 (3d Cir. 1981)).

    The Iowa Supreme Court applied these factors in *Determan*, and determined that

> the defects at issue involve the quality of the home purchased by the plaintiff. Although these defects present a genuine safety hazard to persons and property, that risk has not come to pass. Thus, the injury at present, and the one for which recovery is sought, is limited to repair of the defective construction. The plaintiff is not seeking to recover damages from any 'sudden or dangerous occurrence.' Rather, the plaintiff's damages result from the deterioration of the house due to its poor construction.

*Determan*, 613 N.W.2d at 263 (citations omitted). The Iowa Supreme Court concluded that the remedy in *Determan* was found in contract law, not tort law. *Id.*

    Here, the defect at issue involves the quality of the valves purchased by HWH. HWH offers no evidence of any risk caused by the allegedly defective valves. In its Complaint, HWH does not seek recovery of damages from any "sudden or dangerous" occurrence. Rather, HWH asserts that the allegedly defective valves caused property damage and contained a "serious" product defect. Having considered the factors discussed in *Determan*, the Court concludes that HWH's claim against Deltrol is contractual in nature because the harm caused by the defect was limited to the product, did not result in a sudden or dangerous occurrence, and did not cause physical injury to person or property. *See Determan*, 613 N.W.2d at 261-64; *Nelson*, 426 N.W.2d at 123. Accordingly, the Court determines that HWH's negligence and negligent misrepresentation claims are barred by the economic loss doctrine. *Id.*; *see also Conveyor Co. v. Sunsource Technology Services, Inc.*, 398 F. Supp. 2d 992, 1012-13 (N.D. Iowa 2005) (finding negligent misrepresentation claim barred by the economic loss doctrine).

Therefore, the Court concludes that Deltrol is entitled to summary judgment on HWH's negligence and negligent misrepresentation claims.

## VI. CONCLUSION

For the reasons set forth above, the Court concludes that Deltrol is entitled to summary judgment on HWH's negligence and negligent misrepresentation claims. The Court further concludes that Deltrol is not entitled to summary judgment on HWH's remaining claims.

## ORDER

**IT IS THEREFORE ORDERED** as follows:

The Motion for Summary Judgment (docket number 22) filed by Deltrol is **GRANTED** in part and **DENIED** in part, as set forth above.

DATED this _19th_ day of March, 2009.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA